## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAWN KATZ, *individually and in his representative capacity*,<br><br>    Plaintiff,<br>  v.<br><br>TATA CONSULTANCY SERVICES, LTD.<br><br>    Defendant. | No. 2:22-cv-7069<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## <u>COMPLAINT</u>

Plaintiff Shawn Katz ("Plaintiff") brings this action on behalf of himself and a class of similarly situated individuals to remedy pervasive, ongoing race and national origin discrimination by Defendant Tata Consultancy Services, Ltd. and alleges as follows:

### NATURE OF THE ACTION

1. Tata Consultancy Services, Ltd. ("TCS") is an Indian company that provides information technology ("IT") services, consulting, and business solutions to clients located worldwide. TCS is based in Mumbai, and maintains its U.S. headquarters in Edison, New Jersey. The company employs over 606,000 employees, approximately 40,000 of whom work in the U.S. While only about 12% to 13% of the United States' IT industry (the industry in which TCS operates) is

South Asian, approximately 70% of TCS's United States workforce is South Asian and is primarily composed of non-citizens from India who are in the U.S. on work visas. As discussed further below, this grossly disproportionate workforce is the result of TCS's intentional pattern or practice of employment discrimination against individuals who are not of South Asian race or Indian national origin and its utilization of employment practices that have a disparate impact on these same groups. TCS's discrimination is systemic and ongoing, and impacts non-South Asians and non-Indians across the company, as well as applicants, who are disfavored in TCS's hiring, staffing, promotion, and termination/retention decisions.

2.      TCS's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiff seeks, on his own behalf, and on behalf of a class of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress TCS's discriminatory practices.

**PARTIES**

3.      Plaintiff Shawn Katz is a naturalized U.S. citizen of Israeli national origin and Caucasian race. He is a resident of Texas. Plaintiff is a member of a protected class, as recognized by § 1981 and Title VII. He has exhausted his

2

administrative remedies and has complied with the statutory prerequisites of filing a Title VII complaint by filing a charge against TCS with the U.S. Equal Employment Opportunity Commission and receiving a notice of right to sue.

4.      TCS is an IT consulting company that is headquartered in Mumbai with its U.S. headquarters in Edison, New Jersey. It maintains over twenty offices and delivery centers in the United States.

## JURISDICTION & VENUE

5.      Subject Matter Jurisdiction. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f), *et seq*. and 42 U.S.C. § 1981(a). The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as this dispute is between a citizen of Texas and a foreign corporation headquartered in New Jersey and the amount in controversy exceeds $75,000. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against a foreign corporation.

6.      Personal Jurisdiction. The Court has personal jurisdiction over TCS because it engages in continuous and systematic business contacts within the State of New Jersey and maintains a substantial physical presence in this State, including the operation of its U.S. headquarters in Edison.

3

7.     Venue. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because TCS resides in this District, conducts business in this District, stores records relevant to its employment practices in this District, and engaged in discriminatory conduct in this District. Additionally, TCS engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including the operation of its U.S. headquarters in Edison, New Jersey.

## FACTUAL ALLEGATIONS

### Overview of TCS's Business Model

8.     With operations in over 45 countries and across 150 locations, TCS employs approximately 606,000 people worldwide. In the United States, TCS has over twenty offices and delivery centers and employs an estimated 40,000 people. TCS earned over $25 billion in revenue in the past fiscal year, and derives approximately 50% of its revenue from the Americas, the vast majority of which is earned from its operations in the United States.

9.     TCS operates on a project-based model where companies contract with TCS to provide IT services, thereby utilizing TCS employees in lieu of maintaining in-house IT personnel. When TCS secures a contract with a U.S. client, it must quickly staff the open position(s) or it will lose the project work and revenue to a competitor. Accordingly, TCS staffs open U.S. positions with both its existing

4

employees and external applicants. TCS's existing employees consist of local hires who reside in the U.S. at the time of hire and expats (also known as deputees) who are non-U.S. citizens who TCS brings to the United States on visas for work. Because TCS is an Indian company with the majority of its workforce in India, effectively all of TCS's expats are of South Asian race and Indian national origin. Both existing TCS employees and external applicants must apply and interview for positions on TCS projects and compete for U.S. roles.

10.    Once an employee's position comes to an end, or that individual is removed from the client project, the employee is placed in an unallocated status, referred to as being on the "bench." Once on the bench, employees must again seek new positions within TCS, going through an application and interview process, just as external applicants must. During this period, the employee is encouraged to apply directly to open positions on TCS's internal portal and to work with TCS's staffing group, the Resource Management Group ("RMG"), to locate open positions. If the employee remains on the bench for a prolonged period and cannot find a new position, TCS terminates his or her employment.

<u>Overview of TCS's Discriminatory Scheme</u>

11.    TCS engages in a systematic pattern or practice of discriminating against non-South Asian and non-Indian applicants and employees with respect to hiring, staffing, benching, termination and promotion decisions. This general policy

of discrimination is implemented top-down at TCS, thereby impacting the company as a whole, and harming both non-South Asian and non-Indian applicants and employees alike.

12.     First, with respect to hiring, TCS utilizes both its own recruiters, who are members of the TCS's Talent Acquisition Group, and third party vendors to recruit and hire external applicants from the marketplace. While a hiring decision, by law, cannot be made based on an individual's race or national origin, both the Talent Acquisition Group and TCS's third party vendors are instructed by TCS to seek out and attract Indian candidates. As a result, TCS hires a disproportionately high percentage of South Asians and Indians within the United States that far exceeds the proportion of those individuals in the relevant labor market, and non-South Asian and non-Indian candidates are often passed over for open positions and not hired as a result of this discriminatory practice.

13.     Second, TCS's project staffing decisions similarly reflect a preference for South Asians and Indians. In order to secure visas to increase its U.S. workforce, TCS relies heavily on the U.S. visa system. Because the vast majority of TCS's workforce resides in India, TCS engages in a practice of securing H-1B and L-1 visas for South Asian and Indian employees who it then staffs in U.S. roles. H-1B visas are only available for employees seeking to perform specialty occupations in the United States, and L-1 visas are reserved for managerial employees (L-1A visas)

or intracompany transferees with specialized knowledge relating to the organization (L-1B visas). While L-1 visas can be applied for at any time throughout the year and are not subject to a cap, the federal government annually awards only 65,000 H-1B visas (plus an additional 20,000 for individuals with advanced degrees from American universities) through a highly competitive lottery system. Each year, companies submit H-1B visa petitions at the beginning of April for visas to be awarded later that year which enable it to transfer visa workers to the U.S. starting in October. H-1B visa petitions must identify an actual job at a specific location that the prospective visa worker will fill if awarded a visa.

14.     Each year, TCS seeks to maximize the number of visas it receives from the federal government. It does so by submitting visa petitions for more positions than actually exist in the U.S., allowing it to create an inventory of "visa ready" workers in India available to fill positions in the U.S. when they materialize. To create this inventory, TCS submits large numbers of visa petitions that falsely indicate that specific positions exist, despite the fact that the positions do not exist. TCS also falsifies employee roles listed in its H-1B and L-1A visa applications. While H-1B visas are reserved for employees who perform specialty occupations in the U.S., and L-1A visas can only be awarded to managerial employees, by falsifying employee roles, TCS maximizes the number of visa approvals it can secure each year, and then utilizes these visa holders to perform low-level or non-managerial

work in the U.S.

15.     Between 2013 and 2019, TCS was the consistently one of the top three H1-B visa recipients each year and received more than 51,100 fresh H-1B visas, visa extensions, and visa amendments over this period.   From 2020 to 2022, TCS received around 6,600 new H-1B visas, and over 19,600 H-1B extensions or amendments. TCS has also received over 8,200 new or continuing L-1 visas (visas reserved for those performing managerial work or subject matter experts) between 2015 and 2019, and was the top recipient of L-1 visas in each of those years. All or almost all of the visas TCS secures are on behalf of employees of South Asian race and Indian national origin.

16.     Having securing work visas on behalf of South Asian employees, TCS then prioritizes the placement of these individuals in U.S. jobs. For example, in 2014, TCS leadership implemented a company-wide directive which instructed RMG (the group responsible for staffing open positions) to utilize "visa ready" associates at onsite in the U.S. and to utilize every visa to the maximum extent (i.e., to ensure H-1B visa workers remained in U.S. positions for 6 years and that L-1 visa workers remained in U.S. positions for 7 years, thereby maxing out their visas).

17.     In accordance with prioritizing placement of South Asian visa employees in U.S. positions, the RMG Group has, and continues to, map "visa ready" workers to open U.S. positions, and meticulously tracks the availability of

"visa ready" employees available for U.S. roles. South Asian visa employees are prioritized for open U.S. roles, to the detriment of both external applicants (who are not hired) and local employees (who are passed over for the role).

18.    Third, in order to ensure that visa holders remain in the U.S. and maximize their time on a visa, TCS disproportionately awards these individuals higher appraisal scores and promotes them more frequently than their non-South Asian and non-Indian counterparts. In order to receive a promotion at TCS, the employee must have served in his or her role for a set number of years, and received consecutive high appraisal scores (i.e., either an "A" or a "B" score for multiple years). As a result of TCS's practice of appraising visa holders more highly so that they are promoted and remain in the U.S., senior management at TCS is predominantly South Asian and Indian, and very few non-South Asians and non-Indians are promoted to senior management roles, especially in delivery. Conversely, many non-South Asians and non-Indians are never promoted during their tenure with TCS.

19.    Fourth, TCS maintains a bench policy that results in the disproportionate termination of non-South Asians and non-Indians at the company. At TCS, if an employee remains unallocated and on the bench for too long, he or she is fired. Non-South Asians and non-Indians are far more likely than their South Asian and Indian counterparts to both be placed on the bench, and to remain on the

bench, unable to find a new role. This is because, in accordance with TCS's leadership directive, visa holders are prioritized for open U.S. roles, and often replace non-visa holders in their U.S. positions. Thus, non-visa holders (i.e., non-South Asians and non-Indians) who are removed from their role and placed on the bench are often unable to find a new position, given that open roles are quickly given to South Asian visa workers. So while South Asian visa employees from India are quickly allocated to new roles with their project ends, non-South Asians and non-Indians often languish on the bench, and are fired by TCS when they remain on the bench for too long. Thus, non-South Asians and non-Indians are disproportionately terminated as compared to South Asians and Indians at TCS.

20.     The aforementioned employment practices are both intentionally discriminatory and also result in a disparate impact on non-South Asians and non-Indians. While TCS has a cultural preference for South Asians and Indians, as it is an Indian company, and explicitly favors these groups, it also engages in practices that result in a disparate impact on non-South Asians and non-Indians. For example, TCS's practice of applying for large numbers of work visas and prioritizing visa employees for positions results in available positions overwhelmingly going to South Asian and Indian visa workers, to the exclusion of non-South Asian and non-Indian employees (including benched employees) and job candidates. This results in non-South Asians and non-Indians being hired at lower rates, but also being fired at

disproportionately higher rates. In addition, TCS's practices result in non-South Asians and non-Indians receiving fewer promotions, as promotions are more often awarded to visa holders to ensure they are retained in the U.S. Finally, TCS's bench policy of firing employees who remain on the bench for too long disproportionately impacts non-South Asians and non-Indians as these groups are far more likely to languish on the bench, unable to find a new position within the company.

21.     TCS's U.S. workforce reflects the result of its discriminatory scheme. While only about 12%-13% of the U.S. IT industry is South Asian, approximately 70% of TCS's United States-based workforce is South Asian and Indian, as is, the vast majority of its managerial and supervisory-level staff.

<u>Plaintiff Katz's Experience with TCS's Discrimination</u>

22.     Mr. Katz is an established IT professional with over 20 years of experience managing IT infrastructure, including 14 years of managing complex strategic and tactical programs. Prior to joining TCS, Mr. Katz served as Group IT Director and Consultant for Gilo Ventures for 10 years, managing IT for the holding company as well as its many portfolio companies, and working as a Program Manager for SanDisk for 1.5 years. He specializes in planning, execution, and recovery of high risk projects, transformation programs, IT infrastructure management, and customer engagement and management. Mr. Katz holds a number of licenses and certifications, including in Azure and ITIL, and is a Project

Management Professional and AWS Certified Cloud Practitioner. Today, Mr. Katz manages a cyber security engagement for Capgemini.

23.     Mr. Katz was hired by TCS in May 2013. He joined TCS as a Program Manager, a level "C3B" position, servicing TCS client Microsoft first in California, and then later in Austin, Texas.

24.     In 2021, Mr. Katz assumed the role of a Business Relationship Manager ("BRM"), overseeing the CommonSpirit Health client account, including its deliverables, profits, and losses. This was also a level "C3B" position in which Mr. Katz worked out of TCS's Austin, Texas office. At the time he assumed this role, Mr. Katz was told he would be promoted to a level "C4," but that promotion never took place despite Mr. Katz's consistently strong performance at TCS. In fact, Mr. Katz was never promoted during his nine-year tenure with TCS, despite meeting the qualifications for a promotion for a number of consecutive years.

25.     At TCS, Mr. Katz was consistently rated a ~4.3 out of 5 average performance index, and awarded a "B" rating, the second highest possible rating for the last five consecutive years of his employment with TCS. Mr. Katz received this strong score despite the fact that TCS personnel in India review the objective performance index score and performance band (the letter rating) assigned by an employee's manager and have the authority to change the performance band, despite the fact that these individuals in India do not manage or oversee the employee's

work. Often, the India personnel assign a lower performance band that has no correlation to the employee's performance index. For instance, on one occasion, Mr. Katz's performance band was changed from a B to a C by the India team without any explanation.

26.     Despite his solid performance, TCS failed to give Mr. Katz a single promotion or raise based on his contributions, in contravention of its own policy. Per TCS's promotions policy, in order for Mr. Katz to have received a promotion to the job level designation "C4," he had to have worked in a customer-facing role, have spent at least 3 years in his current designation level of "C3B," and have received an A or B rating for at least 3 years. By May 2022, Mr. Katz had received a B rating for at least 5 years in a row and had spent 9 years in his customer-facing "C3B" role. While he was first recommended for a promotion by his manager Richard Lee (a non-South Asian and non-Indian ) in 2017, Mr. Katz was not promoted. Mr. Katz's subsequent manager, Brenda Lansberry (also a non-South Asian and non-Indian) also continued to support Mr. Katz's promotion, but the promotion never occurred. And while Sutanu Bhattacharyya, Client Partner of the CommonSpirit Health account, had told Mr. Katz that he and his manager, Sub-ISU head, Ajay Krishnaswamy, would write to Human Resources in October 2021 asking that Mr. Katz be promoted to "C4" as the role itself warranted a higher designation, Mr. Katz was still not promoted. Both Mr. Bhattacharyya and Mr. Krishnaswamy are South

Asian and Indian. Instead of receiving a promotion however, Mr. Katz was placed on the bench in April 2022. Mr. Katz was told that his removal from the client project was due to budget cuts, and was not performance related. In fact, even after his release from the CommonSpirit Health client account, Mr. Katz again received a B rating for his strong performance.

27.    While Mr. Katz was on the bench, TCS failed to provide him with any meaningful assistance to obtain a new position. Although Mr. Katz was put in touch with Minal Wani, an RMG employee—the unit charged with actively helping benched employees find new openings by connecting them to hiring managers—his correspondence with her consisted almost entirely of emails from him proactively asking her for assistance. Mr. Katz would provide specific openings to Ms. Wani that he was interested in and well qualified for, and also asked her to refer him to hiring managers for consideration. However, instances when Ms. Wani did send emails on behalf of Mr. Katz (at his prompting) were ineffective. For example, on May 22, 2022, Ms. Wani sent an email to RMG, asking that Mr. Katz be considered for nine different BRM roles he was undoubtedly qualified for (seven roles Mr. Katz himself identified with the Becton Dickenson account and two that RMG had identified on TCS's system iBegin). Mr. Katz received no response from TCS or its hiring managers regarding any of these nine roles.

28.    Mr. Katz was also encouraged to apply directly to openings on TCS's

internal portal. Accordingly, Mr. Katz meticulously applied to at least 36 different roles during his time on the bench. While Mr. Katz received positive feedback on the few interviews that he was offered, following his interviews, he was subsequently ignored and dismissed by TCS. For instance, Mr. Katz interviewed with Sayantan Banerjee (a South Asian and Indian employee) for a BRM role with the Cigna One client account. At the time, Mr. Banerjee expressed excitement at the prospect of Mr. Katz joining the team, only to later ignore Mr. Katz's attempts at contact and never again follow-up with him. Mr. Katz also reached out to Prem Vijoy, a Sub ISU, who had multiple BRM openings that Mr. Katz was suitable for. After having a seemingly positive conversation, Mr. Vijoy (also an Indian individual) told Mr. Katz that he would be in touch within the next three days. Mr. Vijoy not only failed to reach out to Mr. Katz regarding the available positions, but also proceeded to disregard Mr. Katz when he attempted to follow-up as to the status of his candidacy.

29.     Mr. Katz exhausted the list of available BRM positions on TCS's portal and even applied to additional Business Development and Sales positions that were similar to his BRM role in order to maximize his chances of getting selected. He received no response to most of these applications with the exception of one position with MMU Sales for which his candidacy had been suggested and vetted by hiring manager Tony Milan and Sushant Tripathi. However, his application was ultimately

declined by Sanjeev Khanna, who is Indian. While Mr. Khanna informed Mr. Katz that he was looking for someone with greater experience, he had previously hired an Indian employee with the same background as Mr. Katz for the same role just a few months prior. Mr. Katz was ultimately terminated on June 13, 2022. TCS terminated Plaintiff pursuant to the discriminatory employment practices described above.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for TCS's systematic pattern or practice of discriminatory employment practices and based upon individuals' race and national origin and the disparate impact resulting from those practices. This action is brought on behalf of the following class:

> All non-South Asians and non-Indians who (1) were employed by TCS, and met the criteria for a promotion, but were not promoted, and/or (2) were employed by TCS and were involuntarily terminated.

31.     Members of the class are so numerous that joinder is impracticable. While the exact number of class members is unknown to Plaintiff, it is believed to be in the thousands. Furthermore, the class is readily identifiable from information and records in TCS's possession.

32.     There are numerous questions of law and fact common to the class. Among the common questions of law or fact are: (a) whether TCS has engaged in a

pattern or practice of discrimination against non-South Asians and non-Indians in its hiring, staffing, promotion, and termination/retention decisions; (b) whether TCS has intentionally favored South Asians and Indians in hiring, staffing decisions, promotions, and termination/retention decisions and/or whether TCS has intentionally disfavored non-South Asians and non-Indians in hiring, staffing, promotion/demotion, and termination/retention decisions; (c) whether TCS's employment practices have resulted in a disparate impact against non-South Asian and non-Indian individuals; (d) whether TCS has violated § 1981; (e) whether TCS has violated Title VII; (f) whether equitable and injunctive relief is warranted for the class; and (g) whether compensatory and/or punitive damages are warranted for the class.

33.     Plaintiff's claims are typical of the class. All members of the class were damaged by the same discriminatory policies and practices employed by TCS, *i.e.*, they were denied the opportunity to fairly compete for and obtain employment with TCS, were denied positions and promotions within the company, and/or were terminated by the company.

34.     Plaintiff will fairly and adequately protect the interest of other class members because he has no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in class

action employment discrimination litigation to represent him and the class.

35.    Because of TCS's actions, which were taken intentionally and/or with reckless disregard for the federally protected rights of Plaintiff and the class, Plaintiff and the class have suffered substantial harm for which punitive damages are warranted.

36.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because TCS has acted and/or refused to act on grounds generally applicable to the class, making declaratory and injunctive relief appropriate with respect to Plaintiff and the class. Members of the class are entitled to declaratory and injunctive relief to end TCS's discriminatory policies and practices.

37.    Class certification is appropriate pursuant to Rule 23(b)(3) for determination of the damage claims of individual class members because the issue of whether TCS engages in a pattern or practice of race and national origin discrimination and/or its corporate practices result in a disparate impact against non-South Asian and non-Indian individuals is common and predominates over individual issues of proof. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because, among other reasons, certification will avoid the need for repeated litigation by each individual class member. The instant case will be manageable as a class action. Plaintiff knows

of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

38.    In the alternative, class certification is appropriate pursuant to Rule 23(c)(4) to litigate Plaintiff's claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate TCS's discrimination. Certification under this rule is also appropriate to decide whether TCS has adopted a systemic pattern or practice of racial and national origin discrimination and/or has engaged in practices that have resulted in a disparate impact against non-South Asian and non-Indian individuals. Certification under this rule is also appropriate to determine classwide damages, including punitive damages.

## **CLAIMS**

### **COUNT ONE**
Disparate Treatment on the Basis of Race in Violation of 42 U.S.C. § 1981

39.    Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

40.    This claim is brought by Plaintiff on behalf of himself and the Class.

41.    Throughout the class liability period, TCS has engaged in a pattern or practice of discriminating against individuals who are not South Asian by: (a) knowingly and intentionally favoring South Asian individuals in employment decisions, including hiring, staffing, promotion, and termination decisions, (b) knowingly and intentionally disfavoring non-South Asian individuals (including

Plaintiff) in employment decisions, including hiring, staffing, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States that consists of approximately 70% South Asian employees.

42.     As a direct and proximate result of TCS's intentional discrimination, Plaintiff and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with TCS.

43.     TCS's actions constitute unlawful discrimination on the basis of race and citizenship in violation of 42 U.S.C. § 1981.

## COUNT TWO
### Disparate Treatment on the Basis of Race and National Origin
### Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2

44.     Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

45.     This claim is brought by Plaintiffs on behalf of himself and the Class.

46.     Throughout the class liability period, TCS has engaged in a pattern or practice of discriminating against individuals who are not South Asian or Indian by: (a) knowingly and intentionally favoring South Asian and Indian individuals in employment decisions, including hiring, staffing, promotion, and termination decisions, (b) knowingly and intentionally disfavoring individuals who are not South

20

Asian or Indian (including Plaintiff) in employment decisions, including hiring, staffing, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States that consists of approximately 70% South Asian employees (primarily from India).

47.    As a direct and proximate result of TCS's intentional discrimination, Plaintiff and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with TCS.

48.    TCS's actions constitute unlawful discrimination on the basis of race and national origin in violation of 42 U.S.C. § 2000e, *et seq.*

**COUNT THREE**
Disparate Impact on the Basis of Race and National Origin
Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §
2000e-2

49.    Plaintiff re-alleges each preceding paragraph as though fully set forth herein.

50.    This claim is brought by Plaintiff on behalf of himself and the Class.

51.    Throughout the class liability period, TCS has used discriminatory policies and practices related to hiring, staffing, promotion, and termination described herein that have resulted in a disparate impact on non-South Asians and non-Indians who, as a result, are disproportionately   not hired, not selected for

positions, not promoted, benched, and/or terminated. These practices are neither job-related for the positions at issue nor consistent with business necessity.

52.     TCS's actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000e, *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the class pray that the Court award the following relief:

a.     Certify the case as a class action pursuant to Fed. R. Civ. P. 23;

b.     Designate Plaintiff as representative of the class;

c.     Designate Plaintiff's counsel as counsel for the class;

d.     Issue a declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and the Civil Rights Act of 1866, 42 U.S.C. § 1981;

e.     Issue a permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f.     Order Defendant to adopt a valid, non-discriminatory method for hiring, promotion, termination, and other employment decisions;

g.     Order Defendant to post notices concerning its duty to refrain from discriminating against employees on the basis of race and national origin;

h.     Order Defendant not to retaliate against individuals who complain of racial discrimination or national origin discrimination;

i.     Award Plaintiff and the Class damages – including (without limitation) compensatory, exemplary, and punitive damages for the harm they

suffered as a result of Defendant's violations of Title VII and § 1981;

j.     Award Plaintiff and the Class pre- and post-judgment interest at the prevailing rate on the compensatory damages as a result of Defendant's discriminating against them in violation of Title VII and § 1981;

k.     Award Plaintiff and the Class front- and back-pay, instatement, reinstatement, and such other equitable relief as the Court deems just and appropriate;

l.     Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

m.     Award Plaintiff and the Class such other relief as this Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff and the class respectfully demand a trial by jury on all issues properly triable by a jury in this action.


DATED: December 7, 2022                    Respectfully submitted,

                                           /s/Jonathan Rudnick
                                           Jonathan Rudnick, Esq.
                                           The Law Office of Jonathan
                                           Rudnick LLC
                                           788 Shrewsbury Avenue, Suite 204
                                           Tinton Falls, NJ 07724
                                           (732) 842-2070
                                           (732) 879-0213 (Fax)
                                           jonr@ronrudlaw.com

Daniel Kotchen (motion for
admission *pro hac vice* forthcoming)
**KOTCHEN & LOW LLP**
1918 New Hampshire Ave. NW
Washington, DC 20009
Telephone: (202) 471-1995
dkotchen@kotchen.com

*Attorneys for Plaintiff and Putative
Class*