# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHAWN KATZ, DAVID KIRKPATRICK, CAMUEL BUZAN, AND VICTORIA XAVIER-FREYR, *individually and in their representative capacity*,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>TATA CONSULTANCY SERVICES, LTD.<br><br>　　　　　Defendant. | No. 2:22-cv-7069-BRM-JRA<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## <u>THIRD AMENDED COMPLAINT</u>

Plaintiffs Shawn Katz, David Kirkpatrick, Camuel ("Craig") Buzan, and Victoria Xavier-Freyr ("Plaintiffs") bring this action on behalf of themselves and two classes of similarly situated individuals to remedy pervasive, ongoing race, national origin, and citizenship discrimination by Defendant Tata Consultancy Services, Ltd. and allege as follows:

## NATURE OF THE ACTION

1.　Tata Consultancy Services, Ltd. ("TCS") is an Indian company that provides information technology ("IT") services, consulting, and business solutions to clients located worldwide. TCS is based in Mumbai, and maintains its U.S.

headquarters in Edison, New Jersey. The company employs over 606,000 employees, approximately 45,000 of whom work in the U.S. While only about 12% to 13% of the United States' IT industry (the industry in which TCS operates) is South Asian, approximately 70% of TCS's United States workforce is South Asian and is primarily composed of non-citizens from India who are in the U.S. on work visas. As discussed further below, this grossly disproportionate workforce is the result of (1) TCS's intentional pattern or practice of employment discrimination against individuals who are not of South Asian race or Indian national origin and who are U.S. citizens, and (2) and its utilization of employment practices that have a disparate impact on non-South Asians and non-Indians. TCS's discrimination is systemic and ongoing, and impacts non-South Asians, non-Indians, and U.S. citizens across the company, as well as applicants, who are disfavored in TCS's hiring, staffing, promotion, and termination/retention decisions.

2.      TCS's employment practices violate the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("§ 1981") and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). Plaintiffs seek, on their own behalf, and on behalf of two classes of similarly situated individuals, declaratory, injunctive, and other equitable relief, compensatory and punitive damages, including pre- and post-judgment interest, attorneys' fees, and costs to redress TCS's discriminatory practices.

**PARTIES**

3.     Plaintiff Shawn Katz is a naturalized U.S. citizen of Israeli national origin and Caucasian race. He is a resident of Texas. Plaintiff is a member of a protected class, as recognized by § 1981 and Title VII. He has exhausted his administrative remedies and has complied with the statutory prerequisites of filing a Title VII complaint by filing a charge against TCS with the U.S. Equal Employment Opportunity Commission ("EEOC") and receiving a notice of right to sue.

4.     Plaintiff David Kirkpatrick is a citizen of the United States, born in the United States, and of American national origin and Caucasian race. Mr. Kirkpatrick is a resident of Illinois. He is a member of a protected class, as recognized by § 1981 and Title VII. Mr. Kirkpatrick has exhausted his administrative remedies and has complied with the statutory prerequisites of filing a Title VII complaint by filing a charge against TCS with the EEOC and receiving a notice of right to sue.

5.     Plaintiff Craig Buzan is a citizen of the United States, born in the United States, and of American national origin and Caucasian race. Mr. Buzan is a resident of Florida. He is a member of a protected class, as recognized by § 1981 and Title VII. Mr. Buzan has exhausted his administrative remedies and has complied with the statutory prerequisites of filing a Title VII complaint by filing a charge against TCS with the EEOC and receiving a notice of right to sue.

6.     Plaintiff Victoria Xavier-Freyr is a citizen of the United States, born in the United States, and of American national origin and African American race. Ms. Xavier-Freyr is a resident of Ohio. She is a member of a protected class, as recognized by § 1981 and Title VII. Ms. Xavier-Freyr has exhausted her administrative remedies and has complied with the statutory prerequisites of filing a Title VII complaint by filing a charge against TCS with the EEOC and receiving a notice of right to sue.

7.     TCS is an IT consulting company that is headquartered in Mumbai with its U.S. headquarters in Edison, New Jersey. It maintains over twenty offices and delivery centers in the United States.

**JURISDICTION & VENUE**

8.     <u>Subject Matter Jurisdiction</u>. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 2000e-5(f), *et seq.* and 42 U.S.C. § 1981(a). The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as this dispute is between citizens of different states (Texas, Illinois, Florida, and Ohio) and a foreign corporation headquartered in New Jersey and the amount in controversy exceeds $75,000. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) as this matter is a class action with an amount in controversy of greater than $5 million, exclusive of interest and costs, and involves at least one class member who is a citizen of a state and is brought against

4

a foreign corporation.

9.    <u>Personal Jurisdiction</u>. The Court has personal jurisdiction over TCS because it engages in continuous and systematic business contacts within the State of New Jersey and maintains a substantial physical presence in this State, including the operation of its U.S. headquarters in Edison.

10.    <u>Venue</u>. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because TCS resides in this District, conducts business in this District, stores records relevant to its employment practices in this District, and engaged in discriminatory conduct in this District. Additionally, TCS engages in continuous and systematic business contacts within this District, and maintains a substantial physical presence in this District, including the operation of its U.S. headquarters in Edison, New Jersey.

## FACTUAL ALLEGATIONS

### Overview of TCS's Business Model

11.    With operations in over 45 countries and across 150 locations, TCS employs approximately 606,000 people worldwide. In the United States, TCS has over twenty offices and delivery centers and employs an estimated 45,000 people. TCS earned over $28 billion in revenue in the past fiscal year, and derives approximately 50% of its revenue from the Americas, the vast majority of which is earned from its operations in the United States.

12.     TCS operates on a project-based model where companies contract with TCS to provide IT services, thereby utilizing TCS employees in lieu of maintaining in-house IT personnel. When TCS secures a contract with a U.S. client, it must quickly staff the open position(s) or it will lose the project work and revenue to a competitor. Accordingly, TCS staffs open U.S. positions with both its existing employees and external applicants. TCS's existing employees consist of local hires who reside in the U.S. at the time of hire and expats (also known as deputees) who are non-U.S. citizens who TCS brings to the United States on visas for work. Because TCS is an Indian company with the majority of its workforce in India, effectively all of TCS's expats are of South Asian race and Indian national origin. Both existing TCS employees and external applicants must apply and interview for positions on TCS projects and compete for U.S. roles.

13.     Once an employee's position comes to an end, or that individual is removed from the client project, the employee may be placed in an unallocated status within their practice group, referred to as being on the "practice bench," or may be released to the companywide bench. Once on the companywide bench, employees must again seek new positions within TCS, going through an application and interview process, just as external applicants must. During this period, the employee is encouraged to apply directly to open positions on TCS's internal portal and to work with TCS's staffing group, the Resource Management Group ("RMG"), to

locate open positions. If the employee remains on the bench for a prolonged period and cannot find a new position, TCS terminates his or her employment.

<u>Overview of TCS's Discriminatory Scheme</u>

14.    TCS engages in a systematic pattern or practice of discriminating against U.S. citizens and non-South Asian and non-Indian applicants and employees with respect to hiring, staffing, benching, termination, and promotion decisions. This general policy of discrimination is implemented top-down at TCS, thereby impacting the company as a whole, and harming both applicants and employees alike.

15.    First, with respect to hiring, TCS utilizes both its own recruiters, who are members of the TCS's Talent Acquisition Group, and third party vendors to recruit and hire external applicants from the marketplace. While a hiring decision, by law, cannot be made based on an individual's race, national origin, or citizenship, both the Talent Acquisition Group and TCS's third party vendors are instructed by TCS to seek out and attract Indian candidates, including those on valid visas in the U.S. In addition, TCS prefers to hire individuals it deems to be a "culture fit," meaning those who fit TCS's cultural preferences.  As a result, TCS hires a disproportionately high percentage of South Asians and Indians within the United States that far exceeds the proportion of those individuals in the relevant labor market, and non-South Asian and non-Indian candidates (who are mostly U.S.

citizens) are often passed over for open positions and not hired as a result of this discriminatory practice.

16.     Second, TCS's project staffing decisions similarly reflect a preference for South Asians, Indians, and visa employees. In order to secure visas to increase its U.S. workforce, TCS relies heavily on the U.S. visa system. Because the vast majority of TCS's workforce resides in India, TCS engages in a practice of securing H-1B and L-1 visas for South Asian and Indian employees who it then staffs in U.S. roles. H-1B visas are only available for employees seeking to perform specialty occupations in the United states, and L-1 visas are reserved for managerial employees (L-1A visas) or intracompany transferees with specialized knowledge relating to the organization (L-1B visas). While L-1 visas can be applied for at any time throughout the year and are not subject to a cap, the federal government annually awards only 65,000 H-1B visas (plus an additional 20,000 for individuals with advanced degrees from American universities) through a highly competitive lottery system. Each year, companies submit H-1B visa petitions at the beginning of April for visas to be awarded later that year which enable it to transfer visa workers to the U.S. starting in October. H-1B visa petitions must identify an actual job at a specific location that the prospective visa worker will fill if awarded a visa.

17.     Each year, TCS seeks to maximize the number of visas it receives from the federal government and to obtain more visas than its competitors. It does so by

submitting visa petitions for more positions than actually exist in the U.S., allowing it to create an inventory of "visa ready" workers in India available to fill positions in the U.S. when they materialize. To create this inventory, TCS submits large numbers of visa petitions that falsely indicate that specific positions exist, despite the fact that the positions do not exist. TCS also falsifies employee roles listed in its H-1B and L-1A visa applications. While H-1B visas are reserved for employees who perform specialty occupations in the U.S., and L-1A visas can only be awarded to managerial employees, by falsifying employee roles, TCS maximizes the number of visa approvals it can secure each year, and then utilizes these visa employees to perform low-level or non-managerial work in the U.S.

18.    Between 2013 and 2019, TCS was consistently one of the top three H1-B visa recipients each year and received more than 51,100 fresh H-1B visas, visa extensions, and visa amendments over this period.  From 2020 to 2022, TCS received around 6,600 new H-1B visas, and over 19,600 H-1B extensions or amendments. TCS has also received over 8,200 new or continuing L-1 visas (visas reserved for those performing managerial work or subject matter experts) between 2015 and 2019, and was the top recipient of L-1 visas in each of those years. All or almost all of the visas TCS secures are on behalf of employees of South Asian race and Indian national origin.

19.    Having securing work visas on behalf of South Asian employees, TCS

then prioritizes the placement of these visa workers in U.S. jobs. For example, in 2014, TCS leadership implemented a company-wide directive which instructed RMG (the group responsible for staffing open positions) to utilize "visa ready" associates at onsite in the U.S. and to utilize every visa to the maximum extent (i.e., to ensure H-1B visa workers remained in U.S. positions for 6 years and that L-1 visa workers remained in U.S. positions for 7 years, thereby maxing out their visas). Prioritizing placement of visa employees in roles ensures that visa employees' visas are utilized and that the investment required to secure the visas in the first place is not wasted.

20.     In accordance with prioritizing placement of visa employees in U.S. positions, the RMG Group has, and continues to, map "visa ready" workers to open U.S. positions, and meticulously tracks the availability of "visa ready" employees available for U.S. roles. Visa employees (who are almost exclusively South Asian and of Indian national origin) are prioritized for open U.S. roles, to the detriment of both external applicants (who are not hired) and local employees (who are passed over for the role).

21.     Third, in order to ensure that visa employees remain in the U.S. and maximize their time on a visa, TCS disproportionately awards these individuals higher appraisal scores and promotes them more frequently than non-South Asians and non-Indians. In order to receive a promotion at TCS, the employee must have

served in his or her role for a set number of years, and received consecutive high appraisal scores (i.e., either an "A" or a "B" score for multiple years). As a result of TCS's practice of appraising visa employees more highly so that they are promoted and remain in the U.S., senior management at TCS is predominantly South Asian and Indian, and very few non-South Asians and non-Indians are promoted to senior management roles, especially in delivery. Conversely, many non-South Asians and non-Indians (many of whom are U.S. citizens) are never promoted during their tenure with TCS.

22. Fourth, TCS maintains a bench policy that results in the disproportionate termination of non-South Asians, non-Indians, and U.S. citizens at the company. At TCS, if an employee remains unallocated and on the bench for too long, he or she is fired. Non-South Asians and non-Indians are far more likely than their South Asian and Indian counterparts (including those on visas) to both be placed on the bench, and to remain on the bench, unable to find a new role. This is because, in accordance with TCS's leadership directive, visa workers are prioritized for open U.S. roles, and often replace non-visa employees in their U.S. positions. Thus, non-visa employees (who are predominantly non-South Asians and non-Indians) who are removed from their role and placed on the bench are often unable to find a new position, given that open roles are quickly given to visa workers. So while visa employees from India are quickly allocated to new roles with their project

ends, non-South Asians and non-Indians often languish on the bench, and are fired by TCS when they remain on the bench for too long. Thus, as a result of TCS's bench policy, non-South Asians, non-Indians, and U.S. citizens are disproportionately terminated as compared to South Asians and Indians at TCS.

23.    The aforementioned employment practices are intentionally discriminatory and reflect TCS's explicit cultural preference for South Asians and Indians.

24.    Further, TCS's U.S. workforce reflects the result of its discriminatory scheme. While only about 12%-13% of the U.S. IT industry is South Asian, approximately 70% of TCS's United States-based workforce is South Asian and Indian, as is the vast majority of its managerial and supervisory-level staff.

<u>Overview of TCS's Policies and Practices that Disparately Impact non-South Asians and non-Indians</u>

25.    In addition, or in the alternative, TCS has instituted at least three facially neutral employment policies or practices that result in a disparate impact on non-South Asians and non-Indians.

26.    First, TCS has instituted a practice of applying for large numbers of work visas and prioritizing visa employees for positions, a practice that is facially neutral and motivated by a desire to obtain and make use of visas it has secured from the federal government's competitive lottery process.  Specifically, TCS seeks to maximize the number of H-1B and L-1 visas it can obtain each year so that it has a

steady supply of offshore workers available to fill U.S. roles so that client projects and revenue are not lost to competitors. TCS then prioritizes visa employees for positions because visa applications are expensive—costing over $6,000 for an H-1B visa and over $5,000 for an L-1 visa—and TCS wants to ensure that all visas are used to the maximum extent so that it obtains the maximum return on its investment. As a result, available positions overwhelmingly go to visa workers, to the exclusion of non-visa employees (including benched employees) and job candidates. This then results in non-visa workers being hired at lower rates, but also being fired at disproportionately higher rates, as non-visa employees are often replaced by visa employees in their roles. As part of this, TCS implemented its 2014 leadership directive, pursuant to which it emphasized the mapping and tracking "visa ready" employees, *see* ¶¶ 19-20, *supra*—both of which result in visa employees being prioritized for placement in U.S. roles over non-visa employees—to ensure that the investment required to secure visas is not wasted.

27.    Second, TCS's promotion and appraisal policies and practices result in non-visa employees receiving fewer promotions, as promotions are more often awarded to visa employees to ensure they are retained in the U.S. and use their visa (a costly expenditure for TCS) to the maximum extent.

28.    Third, TCS's bench policy, which is race and national origin-neutral, results in non-visa employees being terminated at disproportionately high rates. At

TCS, if an employee remains unallocated and on the bench for too long, he or she is fired. Given TCS's prioritization of visa employees for U.S. roles, non-visa employees are far more likely than their visa-dependent counterparts to both be placed on the bench, and to remain on the bench until termination, unable to find a new role. This is because, in accordance with TCS's leadership directive, visa employees are prioritized and mapped to open U.S. roles, and often replace non-visa employees in their U.S. positions. Thus, non-visa employees who are removed from their role and placed on the bench are often unable to find a new position, given that open roles are quickly given to visa employees. So while visa employees are quickly allocated to new roles when their project ends, non-visa employees often languish on the bench, and are fired by TCS when they remain on the bench for too long.

29.    Despite being facially neutral, the above-described policies and practices disparately impact non-South Asians and non-Indians because all, or almost all, of the employees for whom TCS seeks a U.S. work visa are from India. While visas can be used to bring employees from almost every country to the U.S. for work—and a preference for visa workers is therefore race and national origin-neutral—TCS sources visas from India because the vast majority of TCS's workforce resides in India.

30.    TCS's U.S. workforce, which is approximately 70% South Asian and Indian, reflects the disparate impact of these facially neutral policies and practices.

14

Plaintiff Katz's Experience with TCS's Discrimination

31.    Mr. Katz is an established IT professional with over 20 years of experience managing IT infrastructure, including 14 years of managing complex strategic and tactical programs. Prior to joining TCS, Mr. Katz served as Group IT Director and Consultant for Gilo Ventures for 10 years, managing IT for the holding company as well as its many portfolio companies, and working as a Program Manager for SanDisk for 1.5 years. He specializes in planning, execution, and recovery of high risk projects, transformation programs, IT infrastructure management, and customer engagement and management. Mr. Katz holds a number of licenses and certifications, including in Azure and ITIL, and is a Project Management Professional and AWS Certified Cloud Practitioner. Today, Mr. Katz manages a cyber security engagement for Capgemini.

32.    Mr. Katz was hired by TCS in May 2013. He joined TCS as a Program Manager, a level "C3B" position, servicing TCS client Microsoft first in California, and then later in Austin, Texas.

33.    In 2021, Mr. Katz assumed the role of a Business Relationship Manager ("BRM"), overseeing the CommonSpirit Health client account, including its deliverables, profits, and losses. This was also a level "C3B" position in which Mr. Katz worked out of TCS's Austin, Texas office. At the time he assumed this role, Mr. Katz was told he would be promoted to a level "C4," but that promotion never

took place despite Mr. Katz's consistently strong performance at TCS. In fact, Mr. Katz was never promoted during his nine-year tenure with TCS, despite meeting the qualifications for a promotion for a number of consecutive years.

34.    At TCS, Mr. Katz was consistently rated a ~4.3 out of 5 average performance index, and awarded a "B" rating, the second highest possible rating for the last five consecutive years of his employment with TCS. Mr. Katz received this strong score despite the fact that TCS personnel in India review the objective performance index score and performance band (the letter rating) assigned by an employee's manager and have the authority to change the performance band, despite the fact that these individuals in India do not manage or oversee the employee's work. Often, the India personnel assign a lower performance band that has no correlation to the employee's performance index. For instance, on one occasion, Mr. Katz's performance band was changed from a B to a C by the India team without any explanation.

35.    Despite his solid performance, TCS failed to give Mr. Katz a single promotion or raise based on his contributions, in contravention of its own policy. Per TCS's promotions policy, in order for Mr. Katz to have received a promotion to the job level designation "C4," he had to have worked in a customer-facing role, have spent at least 3 years in his current designation level of "C3B," and have received an A or B rating for at least 3 years. By May 2022, Mr. Katz had received a B rating

for at least 5 years in a row and had spent 9 years in his customer-facing "C3B" role. While he was first recommended for a promotion by his manager Richard Lee (a non-South Asian and non-Indian ) in 2017, Mr. Katz was not promoted. Mr. Katz's subsequent manager, Brenda Lansberry (also a non-South Asian and non-Indian) also continued to support Mr. Katz's promotion, but the promotion never occurred. And while Sutanu Bhattacharyya, Client Partner of the CommonSpirit Health account, had told Mr. Katz that he and his manager, Sub-ISU head, Ajay Krishnaswamy, would write to Human Resources ("HR") in October 2021 asking that Mr. Katz be promoted to "C4" as the role itself warranted a higher designation, Mr. Katz was still not promoted. Both Mr. Bhattacharyya and Mr. Krishnaswamy are South Asian and Indian. Instead of receiving a promotion however, Mr. Katz was placed on the bench in April 2022. Mr. Katz was told that his removal from the client project was due to budget cuts, and was not performance related. In fact, even after his release from the CommonSpirit Health client account, Mr. Katz again received a B rating for his strong performance.

36.    While Mr. Katz was on the bench, TCS failed to provide him with any meaningful assistance to obtain a new position. Although Mr. Katz was put in touch with Minal Wani, an RMG employee—the unit charged with actively helping benched employees find new openings by connecting them to hiring managers—his correspondence with her consisted almost entirely of emails from him proactively

asking her for assistance. Mr. Katz would provide specific openings to Ms. Wani that he was interested in and well qualified for, and also asked her to refer him to hiring managers for consideration. However, instances when Ms. Wani did send emails on behalf of Mr. Katz (at his prompting) were ineffective. For example, on May 22, 2022, Ms. Wani sent an email to RMG, asking that Mr. Katz be considered for nine different BRM roles he was undoubtedly qualified for (seven roles Mr. Katz himself identified with the Becton Dickenson account and two that RMG had identified on TCS's system iBegin). Mr. Katz received no response from TCS or its hiring managers regarding any of these nine roles.

37.    Mr. Katz was also encouraged to apply directly to openings on TCS's internal portal. Accordingly, Mr. Katz meticulously applied to at least 36 different roles during his time on the bench. While Mr. Katz received positive feedback on the few interviews that he was offered, following his interviews, he was subsequently ignored and dismissed by TCS. For instance, Mr. Katz interviewed with Sayantan Banerjee (a South Asian and Indian employee) for a BRM role with the Cigna One client account. At the time, Mr. Banerjee expressed excitement at the prospect of Mr. Katz joining the team, only to later ignore Mr. Katz's attempts at contact and never again follow-up with him. Mr. Katz also reached out to Prem Vijoy, a Sub ISU, who had multiple BRM openings that Mr. Katz was suitable for. After having a seemingly positive conversation, Mr. Vijoy (also an Indian

18

individual) told Mr. Katz that he would be in touch within the next three days. Mr. Vijoy not only failed to reach out to Mr. Katz regarding the available positions, but also proceeded to disregard Mr. Katz when he attempted to follow-up as to the status of his candidacy.

38.    Mr. Katz exhausted the list of available BRM positions on TCS's portal and even applied to additional Business Development and Sales positions that were similar to his BRM role in order to maximize his chances of getting selected. He received no response to most of these applications with the exception of one position with MMU Sales for which his candidacy had been suggested and vetted by hiring manager Tony Milan and Sushant Tripathi. However, his application was ultimately declined by Sanjeev Khanna, who is Indian. While Mr. Khanna informed Mr. Katz that he was looking for someone with greater experience, he had previously hired an Indian employee with the same background as Mr. Katz for the same role just a few months prior. Mr. Katz was ultimately terminated on June 13, 2022. TCS terminated Plaintiff pursuant to the discriminatory employment practices described above. After his termination, his applications for many of the dozens of positions he applied for remained pending.

### Plaintiff Kirkpatrick's Experience with TCS's Discrimination

39.    Mr. Kirkpatrick is a highly skilled and experienced Business Transformation Executive who develops and supports successful projects and

solution implementations. He holds a Bachelor of Science degree from Northern Illinois University and earned a Master of Science degree from the University of Washington in 1985. Mr. Kirkpatrick has almost forty years of professional experience in consulting and specializes in process improvement, process reengineering, process management, performance optimization, and business development and requirement gathering (among others).

40.     Mr. Kirkpatrick was hired by TCS on September 12, 2012. He joined TCS as a business consultant, a job level designation "C4" position, in the Business Process Management group. During Mr. Kirkpatrick's time at TCS, the organization underwent several reorganizations, and, prior to his termination, Mr. Kirkpatrick was a member of the Chief Information Officer ("CIO") Advisory group, which fell under the umbrella of Consulting and Services Integration (C&SI). Mr. Kirkpatrick spent his first four years at TCS servicing its client State Farm, and spent the remainder of his time providing services to Dupont on a merger-and-spin and other projects.

41.     During the first approximately three years of his employment, Mr. Kirkpatrick was consistently given a B or higher appraisal score and received glowing performance reviews. Mr. Kirkpatrick received this strong score (the second highest at TCS) despite the fact that TCS personnel in India review the letter rating assigned by an employee's manager and have the authority to change the

performance band, even though these individuals in India do not manage or oversee the employee's work. It was Mr. Kirkpatrick's observation as a manager that the India personnel, in reviewing performance appraisal scores, often assign a lower score than the employee's manager, which has no correlation to the employee's actual performance index.

42.    At or around the beginning of his fourth year with TCS (2016), Mr. Kirkpatrick was nominated for a promotion to a job level C5 by his manager, Andre Gachter, who was not of South Asian race or Indian descent. Per TCS's promotions policy, Mr. Kirkpatrick was eligible for a promotion because he had been in his job level for at least three years and had received a "B" or better appraisal score for at least two years. However, while he was being considered for a promotion, Mr. Kirkpatrick received his first "C" appraisal rating with no justification or explanation. Mr. Kirkpatrick was then denied a promotion based on his performance rating "trending downward" and was told that he would have to receive two more consecutive years of B or above appraisal scores to again be eligible for a promotion. However, during his more than eleven years at TCS, Mr. Kirkpatrick was never promoted.

43.    In December 2022, the Dupont client projects that Mr. Kirkpatrick had been working on since 2016 came to an end. Mr. Kirkpatrick was told by his manager, Idris Khan, the American Lead of CIO Advisory, who is of South Asian

21

descent, that there were no in-group opportunities within CIO Advisory for Mr. Kirkpatrick. Accordingly, Mr. Kirkpatrick looked for opportunities in the Mergers and Acquisitions (M&A) group. Mr. Kirkpatrick was well-connected in M&A as his work for Dupont had fallen under that group's purview. In fact, beginning in 2019, Mr. Kirkpatrick had sought to have his team transferred from CIO Advisory to M&A, but his efforts had been blocked by Mr. Khan and Praveen Bhasin, second in command in the M&A group, both of whom are Indian of South Asian descent. Through his own efforts, Mr. Kirkpatrick found an upcoming project in M&A for TCS client Cummins Meritor. As the funding for the project was not yet finalized, Mr. Kirkpatrick, along with Mr. Buzan, were allocated to a holding account for the upcoming engagement. This is a common practice at TCS where either the customer or a TCS practice is willing to cover the overhead and expend money to reserve the resource for the upcoming project.

44.    Mr. Kirkpatrick remained allocated to the Cummins Meritor client project until March 2023, when Mr. Khan announced that everyone in CIO Advisory that was allocated to M&A engagements would be removed from that allocation with immediate effect. Further, Mr. Kirkpatrick learned that he and Mr. Buzan had been retroactively stripped of the time they had been allocated to the Cummins Meritor project, which made it appear as though Mr. Kirkpatrick had not been allocated to a project for the past three months, since December 2022. At that point,

Mr. Kirkpatrick was moved to the CIO Advisory practice bench. While he looked for opportunities while on the bench, he was hampered by the directive from Mr. Khan that he not pursue any opportunities falling under the umbrella of the M&A group.

45.    In or around May 2023, Mr. Khan called Mr. Kirkpatrick and told him that he would be released to the company-wide bench overseen by RMG. Following Mr. Khan's phone call, Mr. Kirkpatrick contacted HR to ask for a timeline of actions that would occur while he was on the bench and for TCS's bench policy, but HR refused to provide that information or the policy. Mr. Kirkpatrick received no contact from any members of RMG while on the bench and received no assistance in finding a new opportunity within the company.

46.    While on the bench, Mr. Kirkpatrick was proactive and continued to search for opportunities within TCS. Shortly after being placed on the bench, he found an M&A project that was ramping up through a partner in the M&A practice, Christopher Meyer, who was not South Asian or Indian. Mr. Kirkpatrick and Mr. Buzan were in the process of being allocated to that project when they were informed by Mr. Meyer that he had been ordered to stop the allocation because Mr. Kirkpatrick and Mr. Buzan were barred from joining projects within C&SI (the umbrella group of which both M&A and CIO Advisory were a part) now that they were on the bench. This effectively shut down Mr. Kirkpatrick's ability to find work, given that Mr.

Kirkpatrick had no connection to groups outside the C&SI umbrella and RMG was not providing any assistance to him.

47.    Mr. Kirkpatrick was terminated by TCS on July 24, 2023. TCS terminated Mr. Kirkpatrick pursuant to the discriminatory employment practices described above.

<u>Plaintiff Buzan's Experience with TCS's Discrimination</u>

48.    Mr. Buzan is a Senior IT Strategy Consultant who has extensive experience in Information Technology and Management Consulting. He holds a Bachelor of Science degree in Engineering from the United States Military Academy at West Point and a Master of Science degree in Operations Analysis from the Naval Postgraduate School. Mr. Buzan spent eleven years in the United States Army, serving as an officer. With over forty years of professional experience, Mr. Buzan has developed strong consultant leadership skills, is able to solve complex issues for clients, and has significant experience working in high-pressure scenarios. Prior to joining TCS, Mr. Buzan worked as a Principal Consultant for HP Enterprise Services.

49.    Mr. Buzan was hired by TCS in February 2013 as a Senior Manager, a job level "C4" position. Throughout his tenure, he was a member of TCS's Management Consulting group. While TCS went through several reorganizations, prior to his termination, like Mr. Kirkpatrick, Mr. Buzan was a member of CIO

Advisory, under the umbrella of C&SI and reported to Mr. Khan via his direct supervisor, Chris Vallianatos. Mr. Buzan spent his first four years at TCS servicing State Farm, and then worked for a variety of different TCS clients, including Walgreens, Dupont, and Cummins Filtration.

50.    While at TCS, Mr. Buzan almost always exceeded his billability target (i.e., the percentage of the year to which he was allocated to a client project), which ranged from approximately 75-80%, often achieving over 90% billability. He received positive reviews and high ratings. Mr. Buzan was awarded a "B" appraisal score, the second highest rating, for the last five consecutive years of his employment with TCS (2018 to 2022). Mr. Buzan received this strong score despite the fact that TCS personnel in India reviewed his letter rating assigned by his manager and had the authority to change that performance band even though they had no knowledge of Mr. Buzan's work or job performance.

51.    Despite receiving high appraisal scores and performing well, TCS never promoted Mr. Buzan, in contravention of its own policy.

52.    In October 2022, Mr. Buzan completed a project for Cummins Filtration and began to seek out his next position within TCS. As noted above, Mr. Buzan, along with Mr. Kirkpatrick, found a project in the M&A group for TCS client Cummins Meritor that was ramping up. Mr. Buzan was allocated to a holding account for the Cummins Meritor project, beginning in or around January 2023.

53.    However, at the end of February or early March 2023, Mr. Buzan's allocation to the Cummins Meritor holding account was removed and he learned via Mr. Vallianatos that Mr. Khan would no longer allow Mr. Buzan to work on projects outside of CIO Advisory. In addition, Mr. Buzan's allocation to the Cummins Meritor holding account up to that point was backed out of his timecard and he was retroactively allocated to a practice Work Order Number ("WON")—a number assigned to employees when they remain within a group but are not allocated to a project—which impacted his billability rate.

54.    At the beginning of April 2023, Mr. Buzan was unassigned from the practice WON, but did not receive any information from TCS as to whether he was being placed on the practice bench or the company-wide bench, or what his next steps would be. In mid-April 2023, Mr. Buzan asked Mr. Khan for information about his status, and Mr. Khan told Mr. Buzan that his profile was being circulated to RMG. Mr. Buzan asked whether he was formally being moved to the company-wide bench overseen by RMG, and Mr. Khan responded that he would be unless he found a project. Mr. Buzan contacted TCS's HR department to ask what was going on, including who he should talk or report to and what the timeline would be, but he did not receive any more information. Mr. Buzan remained uncertain of his status through April and into May 2023.

55.    In early June 2023, Mr. Buzan learned for the first time that he had been

allocated to the companywide bench. Mr. Buzan was never contacted by anyone from RMG about what actions he should be taking while on the bench or how to search for and apply to open roles. He also was not sent any positions by RMG to apply to directly.

56.    While he was on the bench, Mr. Buzan learned from Mr. Meyer, whom Mr. Buzan had worked with at Dupont and Cummins Filtration, that there were additional open projects in M&A for Mr. Buzan to join. He and Mr. Kirkpatrick were in the process of being allocated to one such project when they were informed by Mr. Meyer that he had been ordered to stop the allocation because Mr. Kirkpatrick and Mr. Buzan were barred from joining projects within C&SI (the umbrella group of which both M&A and CIO Advisory were a part) now that they were on the companywide bench. This eliminated Mr. Buzan's ability to find work within TCS, given that Mr. Buzan had no connection to groups outside the C&SI umbrella and RMG did not provide any assistance to him while on the bench.

57.    On July 20, 2023, Mr. Buzan received a phone call from TCS's HR department, informing him of his termination. The HR representative stated that the criteria for termination was anyone on the bench, and that he had been selected for termination. TCS terminated Mr. Buzan pursuant to the discriminatory employment practices described above.

<u>Plaintiff Xavier-Freyr's Experience with TCS's Discrimination</u>

58.    Ms. Xavier-Freyr is a Principal Consultant – Product Development who has over twenty years of professional experience in management and leadership roles. She holds a bachelor's degree in International Relations from the University of Mary Washington and a Master of Legal Studies from Purdue University. Ms. Xavier-Freyr is an agile expert who specializes in systems engineering and integration, internet/web and mobile technology, systems design and architecture, data management, IT management and development, TELECOM, ecommerce, cloud, and analytics (among others).

59.    Ms. Xavier-Freyr was hired by TCS on September 29, 2014. She joined as a senior program manager, a job level C3A role, first servicing TCS client JPMorgan Chase and later working on projects for Citibank, CK Global, and Bayer, among others. Ms. Xavier-Freyr was hired into the Digital Engagement Services and Support ("DESS") practice and transitioned to the Customer Experience and Transformation ("CXT") group (which falls under the C&SI umbrella) after organizational shifts in 2017. Ms. Xavier-Freyr was told during the recruitment process that she would be brought in at a job level C4 or C5, given her extensive relevant experience, but she was instead assigned to a job level C3A, which was two steps below the C4 job level. In or around 2018 or 2019, Mr. Xavier-Freyr's job level was raised to C3B but aside from that, she never received a promotion or role change at TCS.

28

60.    Ms. Xavier-Freyr's efforts to qualify for a promotion were hampered by TCS's appraisal policies. Pursuant to these policies, project managers were instructed to allot a limited number of points among a group of resources. These points were then used to assign employees an appraisal score (employees who had received more points from the project managers would ultimately receive higher appraisal scores). Mr. Xavier-Freyr understood from multiple conversations with colleagues that employees in the U.S. on visas (the vast majority of whom were South Asian of Indian descent) were consistently allotted more points and therefore received higher grades than non-visa dependent employees. As a result, Ms. Xavier-Freyr consistently received lower appraisal scores than her colleagues on visas, who were oftentimes South Asian of Indian descent. Ms. Xavier-Freyr observed that her South Asian and Indian colleagues were also promoted far more frequently than her non-South Asian and non-Indian colleagues.

61.    During most of her time at TCS, when Ms. Xavier-Freyr was assigned to a client project, she would be allocated to a project WON. When she was between projects, Ms. Xavier-Freyr would be allocated to a practice WON while she applied to and interviewed for projects within her practice. While Ms. Xavier-Freyr repeatedly sought management relationship positions while looking for a new role, she was denied these positions.

62.    In or around March or April 2022, Ms. Xavier-Freyr completed a

project for Bayer and was allocated to a practice WON while she looked for a new role. Ms. Xavier-Freyr applied for every position made available to her within CXT—at least fifteen—but was not hired for any of them. During that time, and having exhausted every opportunity within CXT, Ms. Xavier-Freyr was asked by the Cloud AWS group to join one of their cloud-based projects. Ms. Xavier-Freyr attempted to join that project, but then learned that she had been blocked by Varun Goenka, who is South Asian of Indian descent. Soon after, Ms. Xavier-Freyr learned from HR that she was being terminated. Ms. Xavier-Freyr does not know when she was allocated to the company-wide bench overseen by RMG, but she understands that she was terminated from that bench. Ms. Xavier-Freyr learned that she had been selected for termination in June 2023, and her official termination date was July 24, 2023.

## CLASS ACTION ALLEGATIONS

63.    Plaintiffs bring this Class Action pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), seeking injunctive, declaratory, equitable, and monetary relief for TCS's systematic pattern or practice of discriminatory employment practices based upon individuals' race, national origin, and citizenship and the disparate impact resulting from employment practices engaged in by TCS. This action is brought on behalf of the following classes:

All non-South Asians and non-Indians who (1) were employed by TCS, and met the criteria for a promotion, but were not promoted, and/or (2) were employed by TCS and were involuntarily terminated.

All U.S. citizens who (1) were employed by TCS, and met the criteria for a promotion, but were not promoted, and/or (2) were employed by TCS and were involuntarily terminated.

64.    Members of the classes are so numerous that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed to be in the thousands. Furthermore, the classes are readily identifiable from information and records in TCS's possession.

65.    There are numerous questions of law and fact common to the classes. Among the common questions of law or fact are:  (a) whether TCS has engaged in a pattern or practice of discrimination against non-South Asians, non-Indians, and U.S. citizens in its hiring, staffing, promotion, and termination/retention decisions; (b) whether TCS has intentionally favored South Asians and Indians (including those on visas) in hiring, staffing decisions, promotions, and termination/retention decisions and/or whether TCS has intentionally disfavored non-South Asians, non-Indians, and U.S. citizens in hiring, staffing, promotion/demotion, and termination/retention decisions; (c) whether TCS's employment practices have resulted in a disparate impact against non-South Asian and non-Indian individuals; (d) whether TCS has violated § 1981; (e) whether TCS has violated Title VII; (f) whether equitable and injunctive relief is warranted for the classes; and (g) whether

compensatory and/or punitive damages are warranted for the classes.

66.    Plaintiffs' claims are typical of the classes. All members of the classes were damaged by the same discriminatory and facially neutral policies and practices employed by TCS, *i.e.*, they were denied the opportunity to fairly compete for and obtain employment with TCS, were denied positions and promotions within the company, and/or were terminated by the company.

67.    Plaintiffs will fairly and adequately protect the interest of other class members because they have no interest that is antagonistic to or which conflicts with those of any other class member, and Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel experienced in class action employment discrimination litigation to represent them and the classes.

68.    Because of TCS's actions, which were taken intentionally and/or with reckless disregard for the federally protected rights of Plaintiffs and the classes, Plaintiffs and the classes have suffered substantial harm for which punitive damages are warranted.

69.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because TCS has acted and/or refused to act on grounds generally applicable to the classes, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the classes. Members of the classes are entitled to declaratory and injunctive relief to end TCS's discriminatory policies and

practices and its facially neutral policies and practices that result in a disparate impact on non-South Asians and non-Indians.

70.    Class certification is appropriate pursuant to Rule 23(b)(3) for determination of the damage claims of individual class members because the issue of whether TCS engages in a pattern or practice of race, national origin, or citizenship discrimination and/or its corporate practices result in a disparate impact against non-South Asian and non-Indian individuals is common and predominates over individual issues of proof. Class certification under Rule 23(b)(3) would be superior to other methods for fair and efficient resolution of the issues because, among other reasons, certification will avoid the need for repeated litigation by each individual class member. The instant case will be manageable as a class action. Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

71.    In the alternative, class certification is appropriate pursuant to Rule 23(c)(4) to litigate Plaintiffs' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate TCS's discrimination. Certification under this rule is also appropriate to decide whether TCS has adopted a systemic pattern or practice of race, national origin, and citizenship discrimination and/or has engaged in practices that have resulted in a disparate impact against non-South Asian and non-Indian individuals. Certification under this rule is also

appropriate to determine classwide damages, including punitive damages.

## CLAIMS

### COUNT ONE
Disparate Treatment on the Basis of Race in Violation of
42 U.S.C. § 1981

72.     Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

73.     This claim is brought by Plaintiffs on behalf of themselves and the Class.

74.     Throughout the class liability period, TCS has engaged in a pattern or practice of discriminating against individuals who are not South Asian by: (a) knowingly and intentionally favoring South Asian individuals in employment decisions, including hiring, staffing, promotion, and termination decisions, (b) knowingly and intentionally disfavoring non-South Asian individuals (including Plaintiffs) in employment decisions, including hiring, staffing, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States that consists of approximately 70% South Asian employees.

75.     As a direct and proximate result of TCS's intentional discrimination, Plaintiffs and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to

promotion and/or continued employment with TCS.

76.    TCS's actions constitute unlawful discrimination on the basis of race in violation of 42 U.S.C. § 1981.

## COUNT TWO
Disparate Treatment on the Basis of Race and National Origin
Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §
2000e-2

77.    Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

78.    This claim is brought by Plaintiffs on behalf of themselves and the Class.

79.    Throughout the class liability period, TCS has engaged in a pattern or practice of discriminating against individuals who are not South Asian or Indian by: (a) knowingly and intentionally favoring South Asian and Indian individuals in employment decisions, including hiring, staffing, promotion, and termination decisions, (b) knowingly and intentionally disfavoring individuals who are not South Asian or Indian (including Plaintiff) in employment decisions, including hiring, staffing, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States that consists of approximately 70% South Asian employees (primarily from India).

80.    As a direct and proximate result of TCS's intentional discrimination,

Plaintiff and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with TCS.

81.     TCS's actions constitute unlawful discrimination on the basis of race and national origin in violation of 42 U.S.C. § 2000e, *et seq.*

**COUNT THREE**
Disparate Impact on the Basis of Race and National Origin
Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §
2000e-2

82.     Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

83.     This claim is brought by Plaintiffs on behalf of themselves and the Class.

84.     Throughout the class liability period, TCS has used discriminatory policies and practices related to hiring, staffing, promotion, and termination described herein that have resulted in a disparate impact on non-South Asians and non-Indians who, as a result, are disproportionately not hired, not selected for positions, not promoted, benched, and/or terminated. These practices are neither job-related for the positions at issue nor consistent with business necessity.

85.     TCS's actions constitute unlawful discrimination in violation of 42 U.S.C. § 2000e, *et seq.*

## COUNT FOUR
Disparate Treatment on the Basis of Citizenship in Violation of
42 U.S.C. § 1981

86.    Plaintiffs re-allege each preceding paragraph as though fully set forth herein.

87.    This claim is brought by Plaintiffs on behalf of themselves and the Class.

88.    Throughout the class liability period, TCS has engaged in a pattern or practice of discriminating against individuals who are U.S. citizens by: (a) knowingly and intentionally favoring visa workers (i.e., non-citizens) in employment decisions, including hiring, staffing, promotion, and termination decisions, (b) knowingly and intentionally disfavoring U.S. citizens (including Plaintiffs) in employment decisions, including hiring, staffing, promotion, and termination decisions, and (c) knowingly and intentionally creating and maintaining an overwhelmingly disproportionate workforce in the United States that consists of approximately 70% South Asian employees (the vast majority of whom are on visas).

89.    As a direct and proximate result of TCS's intentional discrimination, Plaintiffs and members of the class have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to promotion and/or continued employment with TCS.

90.    TCS's actions constitute unlawful discrimination on the basis of citizenship in violation of 42 U.S.C. § 1981.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the classes pray that the Court award the following relief:

a.    Certify the case as a class action pursuant to Fed. R. Civ. P. 23;

b.    Designate Plaintiffs as representative of the classes;

c.    Designate Plaintiffs' counsel as counsel for the classes;

d.    Issue a declaratory judgment that the practices complained of herein are unlawful and violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and the Civil Rights Act of 1866, 42 U.S.C. § 1981;

e.    Issue a permanent injunction against Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f.    Order Defendant to adopt a valid, non-discriminatory method for hiring, promotion, termination, and other employment decisions;

g.    Order Defendant to post notices concerning its duty to refrain from discriminating against employees on the basis of race, national origin, and citizenship;

h.    Order Defendant not to retaliate against individuals who complain of race, national origin, or citizenship discrimination;

i.    Award Plaintiffs and the Classes damages – including (without limitation) compensatory, exemplary, and punitive damages for the harm they suffered as a result of Defendant's violations of Title VII and § 1981;

j.    Award Plaintiffs and the Classes pre- and post-judgment interest at the

38

prevailing rate on the compensatory damages as a result of Defendant's discriminating against them in violation of Title VII and § 1981;

k.   Award Plaintiffs and the Classes front- and back-pay, instatement, reinstatement, and such other equitable relief as the Court deems just and appropriate;

l.   Award reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

m.   Award Plaintiffs and the Classes such other relief as this Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs and the classes respectfully demand a trial by jury on all issues properly triable by a jury in this action.

DATED: May 1, 2025                    Respectfully submitted,

/s/Jonathan Rudnick
Jonathan Rudnick, Esq.
The Law Office of Jonathan Rudnick LLC
788 Shrewsbury Avenue, Suite 204
Tinton Falls, NJ 07724
(732) 842-2070
(732) 879-0213 (Fax)
jonr@ronrudlaw.com

Daniel Kotchen (*pro hac vice*)
Lindsey Grunert (*pro hac vice*)
**KOTCHEN & LOW LLP**
1918 New Hampshire Ave. NW
Washington, DC 20009
Telephone: (202) 471-1995
dkotchen@kotchen.com
lgrunert@kotchen.com

*Attorneys for Plaintiffs and Putative Class*